# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 75404-1-I |
| | ) | |
| B.M.A. DOB: 10/28/2008 | ) | DIVISION ONE |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: June 12, 2017 |

APPELWICK, J. — Following a 29 month dependency during which S.G. made little progress with court ordered services, the superior court terminated his parental rights to his daughter B.A. On appeal, he challenges the court's denial of the Yakama Nation Tribe's motion to transfer jurisdiction to the tribal court under the federal and state Indian Child Welfare Acts, ICWA[1] and WICWA.[2] He also challenges the court's conclusion that the Department of Social and Health Services (Department) satisfied the statutory prerequisites to termination. We affirm.

## FACTS

### Pretrial History

S.G. is an enrolled member of the Yakama Nation Tribe (Tribe) and the biological father of a girl, B.A., born in October 2008.[3] Because B.A. is an Indian child, the proceedings below were governed in part by ICWA and WICWA.

---

[1] Indian Child Welfare Act, 25 U.S.C. § 1901.
[2] Washington Indian Child Welfare Act, chapter 13.38 RCW.
[3] B.A.'s mother's parental rights were terminated in a separate proceeding.

In early 2014, the superior court entered separate orders of dependency as to B.A.'s parents. S.G.'s agreed order stated in part:

> On 12/26/2013, the mother came into the Office of Indian Child Welfare and stated that she could no longer take care of her children. She stated that she was not ever meant to be a mother and is unable to protect her daughter [B.A.] from her older child . . . . The mother stated that she wanted to relinquish her rights as a parent. She stated that she was not ever cut out to be a parent and they would be better off without her. . . .
>
> . . . Law enforcement placed [the children] in protective custody . . . at the Office of Indian Child Welfare.

The next day, the children were placed with their current foster care parents in a residence located off the Yakama Nation reservation.

The dependency order detailed S.G.'s lengthy criminal history, including his current incarceration for attempting to elude, possession of cocaine, and his third DUI (driving while under the influence).[4] The order stated that S.G. "has three other children that he has not parented." The order directed S.G. to complete random urinalysis, inpatient drug and alcohol treatment including any recommended treatment, a parenting assessment and recommended treatment, and family preservation services.

In November 2014, the Tribe petitioned to intervene in the dependency. In February 2016, it petitioned to transfer jurisdiction under 25 U.S.C. § 1911(b) of the ICWA to the children's court of the Tribe. S.G. filed a brief supporting the Tribe's

---

[4] Gladstone's crimes include DUIs, assaults, delivery of cocaine, driving while license suspended, burglary, possession of drug paraphernalia, vehicle prowling, malicious mischief, taking a motor vehicle without permission, and trespass.

2

petition. B.A.'s mother objected to the transfer. In an order denying the Tribe's motion to transfer, the court stated:

> The current guidelines, provide, in part:
>
>> IV Guidelines for State Courts and Agencies in Indian Child Custody Proceedings:
>>
>> . . .
>>
>> (a) Upon receipt of a petition to transfer by a parent, Indian custodian or the Indian child's tribe, the State court must transfer the case unless <u>any</u> of the following criteria are met:
>>
>> (1) <u>Either parent objects to such transfer</u>;
>>
>> . . . .
>>
>> (3) The court determines that good cause exists for denying the transfer.
>
> . . . .
>
> Thus it is clear from the language of the guidelines that <u>either parent . . . may bar the transfer</u>, without consideration of whether good cause exists to deny the transfer. This is consistent with the very few cases that have discussed the issue, as discussed in the Department's legal memorandum, and with at least one well-respected compendium of Indian Law. National Indian Law Library, <u>A Practical Guide to the Indian Child Welfare Act §7</u> (Transfers) (On-Line version) . . . . The motion for transfer is therefore denied.

(Boldface omitted) (emphasis added).

In October 2015, the Department petitioned to terminate S.G.'s parental rights. The petition alleged in part:

> 2.5e The father . . . has been in and out of jail throughout the dependency action. When he is not incarcerated, he has not participated in any of his court ordered services. [S.G.] has been released from his DOSA [(drug offender sentencing alternative)] sentence since November 2014 and has not been in contact with the Department since that time to begin engaging in his services. [S.G.] has not visited with [B.A.] except for one phone

3

conversation in November 2014, prior to his release. Since his release he has made no attempts to visit with his daughter. Phone calls and service letters in attempts to get [S.G.] engaged in services have gone unanswered.

2.5f [S.G.] has a significant history of long-term drug abuse resulting in legal issues and [an in]ability to maintain stable housing. [S.G.]'s drug use impacts his ability to function in every aspect of his life and would jeopardize the health, safety, and wellbeing of his daughter. S.G. has 2 adult children as well as a 9 year old that he has not parented.

2.5g Due to the parents' unwillingness to engage in their court ordered services, their unresolved legal issues, as well as their pervasive and unaddressed substance abuse issues, they are unable to provide a safe and sober home environment.

Termination Trial

Trial commenced in May 2016, but S.G. did not appear. MeLisa Carson, a Department social worker, testified that she oversaw B.A.'s case from November 2014 until trial. She had "limited contact" and only "a couple of meetings in person" with S.G. during the dependency.

Carson attempted to contact S.G. through service letters she sent to the address S.G. gave her.[5] Her February 2015 service letter stated that she had not heard from S.G. since she took over the case in November 2014. The letter detailed S.G.'s court ordered services, his service providers, and their phone numbers. It also said "contact me as soon as possible so that I can make referrals for you, if you need." Carson provided similar information in four additional letters in 2015 and three more in 2016. S.G. never responded. Nor did he ask that correspondence be sent to a different address.

---

[5] Carson testified that Gladstone gave her his mother's address and said that was where he would be receiving his mail.

4

Carson also attempted to contact S.G. by phone but his voicemail was full, not set up, or replaced with a message "that the phone's not in service." She actively looked for S.G. by checking jail rosters every two to three months and asking his mother if she had seen him. Carson did not recall any phone calls or information indicating that he entered inpatient treatment in November 2015.

Carson testified that S.G. did not complete his court ordered urinalysis, drug/alcohol treatment, and parenting assessment. He did complete paternity testing and the inpatient treatment ordered in his criminal case, but he failed to complete follow-up outpatient treatment in the criminal case.

In Carson's view, S.G.'s primary parental deficiency was untreated substance abuse. She testified that the impact of this deficiency was far reaching, undermining his parenting, employment, housing, and his ability to safely parent B.A. His DUIs demonstrated a serious safety risk for B.A., and S.G. had no housing or employment at the time of trial. His substance abuse also impacted his ability to handle B.A.'s special needs, which include PTSD (posttraumatic stress disorder), anxiety, and tantrums that can be harmful to herself or others. Carson testified that B.A. has

> a lot of anxiety around transitions and especially . . . transitioning to an environment that is chaotic. When you don't have housing or . . . a place to stay, that could be very chaotic for a child. And given that [B.A.] has PTSD and anxiety and a variety of behavioral issues, it would be really important that wherever she is placed is secure and stable and a place that she can ease into a transition.

B.A. also has an academic IEP, "which requires a lot of advocacy on the part of her caregiver" and "a lot of meetings with the school." B.A. sees two therapists—one for

attachment issues and one for trauma. Carson doubted S.G.'s "ability to get her to those appointments" or to advocate for needs arising from those treatments.

Carson testified that S.G. had not taken "any active role in learning about [B.A.]'s special needs" and does not have "any form of relationship with [B.A.]" His contact with her during the dependency consisted of a phone visit in 2014 and an unauthorized contact when B.A. was visiting her grandmother. S.G. never set up a visit through the Department. At the time of trial, a court order prohibited him from visiting B.A. due to her negative reaction to his prior contacts.

Carson concluded there was no likelihood that S.G. could remedy his parental deficiencies in the near future. When asked if it would be reasonable for B.A. to wait another six months, Carson said "No," explaining that "it's been two years and [B.A.] has a lot of anxiety about her placement. I think she needs to know permanently . . . what her future looks like." Carson also said that B.A. would be at "risk of serious emotional harm if [she] were returned to her father." She added that B.A. had always been placed with her brother J.A., that they were very close, and that separating them would not be in B.A.'s best interest. Carson concluded termination was in B.A.'s best interest because she wants to stay with her brother and be adopted by her foster parents, and that can only happen if S.G.'s rights are terminated.

Carson discussed guardianship with B.A.'s foster parents, but they preferred adoption. The Tribe preferred guardianship to termination but never proposed a specific placement for B.A. In fact, at the time of trial, no one had offered to be a guardian for

6

B.A. S.G. suggested his mother as a potential placement, but the Department concluded her age and health issues disqualified her given B.A.'s special needs.

On cross-examination, S.G.'s counsel asked if the Department had reached out to S.G.'s other family members regarding placement. Carson replied that the Department's placement unit always sends "letters out to all family members for both sides of the family that they can find." Carson conceded she did not "refresh" those searches when she joined the case. She testified, however, that she asked S.G. and his mother for names of extended family members but none were provided.

Kathy Elias, B.A.'s court appointed special advocate (CASA), testified that at the time of her appointment, S.G. "was not active, was not engaging, and had not sought or participated in any of the services." B.A. "had a lot of mental health issues" but "had a skilled foster family that was dealing with those issues." B.A. told Elias that "she would like to stay in the home that she's in forever" and "wants to stay with her little brother."

Elias identified S.G.'s primary parental deficiencies as lack of employment and housing, a long history of substance abuse, and periodic incarceration. Elias called this "a very telling record that I've seen many times." She added that "where there are so many deficiencies, it's very rare for a parent to suddenly be able to become . . . a competent parent." She noted that during the first 18 months of the dependency,

> [S.G.] was nowhere. He expressed no interest in his child. He never asked about her. Other than the one phone call, he never asked for visits, didn't engage in any of the services he was ordered to. And, now, another year has passed. It's been two and a half years into . . . this process of uncertainty for the child. And he doesn't appear to be showing any ability to . . . become a parent.

7

Elias testified it would take S.G. a minimum of six to twelve months to correct his deficiencies. She concluded termination was in B.A.'s best interest because she had been in foster care for two and a half years and "can't begin to address her insecurities, her anxieties, . . . her mental health problems, her stability needs until this legal matter is decided once and for all." She believed it was "vital for [B.A's] wellbeing" to know that she will be adopted and that her situation is permanent."

Elias testified that she had not contacted the Tribe, nor had they contacted her. She had no contact information for S.G. and had never received "any information like that" from S.G. or his attorney. On cross-examination, she acknowledged that she did not seek out S.G.'s contact information or attempt to facilitate his use of services.

Roberta Fletcher, a chemical dependency counselor with the Seattle Indian Health Board, testified that she did two intake assessments of S.G. in the summer of 2015. The first resulted in outpatient treatment, but S.G. stopped attending. The second resulted in a referral for inpatient treatment that S.G. eventually completed at Thunderbird Treatment Center.

Susan Shannon, a counselor at the Thunderbird Treatment Center, testified that she counseled S.G. during his inpatient treatment in November 2015. His issues stemmed from alcohol, cocaine, and cannabis abuse. Shannon recalled S.G. attempting to contact his social worker several times during treatment. When he completed the program, Shannon recommended outpatient treatment.

Jeffrey Mitchell, a chemical dependency professional with the Seattle Indian Health Board, provided outpatient services to S.G. for a short period in December 2015.

He diagnosed S.G. with cocaine, alcohol, and cannabis dependence. Although outpatient treatment normally consists of 24 group meeting over 3 months, S.G. left the program after only 6 meetings.

Support Enforcement Officer Christopher Glaser testified that S.G. owes back child support for B.A. and several other children. As of February 2016, he owed over $40,000 in back support to children other than B.A.

B.A.'s foster mother, F.P., testified that she has cared for B.A. for two and a half years. She also cares for B.A.'s brother J.A. Although B.A.'s anxiety has improved, it can escalate into "hitting, kicking, throwing things, screaming, yelling, . . . hitting herself, violence towards other members of the home or the animals." B.A. also solicits inappropriate contact from strangers—primarily males—by "giving them hugs, or asking them if they thought she was pretty." B.A. is not allowed to have scissors because she impulsively cuts things, including her clothes.

B.A.'s days "are very scheduled," but "[i]f the schedule does not go as planned," she can become "very anxious" and escalate into the behaviors mentioned above. F.P. testified that B.A. has not expressed an interest in having a relationship with S.G. F.P. noted that after an initial phone contact with B.A., S.G. said he was going to communicate with her through letters but never did.

B.A. is bonded with her brother J.A. and F.P. testified that separating the children "would be devastating for [B.A.]. It would be another loss in a series of losses that she's experienced during her early life." F.P. stated that B.A. wants her foster parents to adopt her and that they are eager to do so.

9

F.P. testified that they have fostered B.A.'s Indian heritage by engaging her in drum-making, jingle dance lessons, a Native American storytelling summer camp, and attending local powwows. She testified they have not attended activities at the Yakama Nation Reservation in part because "traveling with [B.A.] can be stressful." But, it is their "hope that we can get [B.A.] to the point where we could make that trip along with other trips to . . . areas that are important to her culture." When asked on cross-examination why they preferred adoption over a guardianship, F.P. said a guardianship would not provide the services B.A. requires because of her special needs. She conceded she had not discussed the possibility of Social Security Disability Insurance with the Department.[6]

Family therapist Theresa Strutynski testified that she has treated B.A. for anxiety and PTSD for two and half years. B.A. also shows some symptoms of reactive attachment disorder. B.A. has never discussed S.G. in therapy. When Strutynski brings him up, B.A. "deflects" and "doesn't go there." B.A. continues to need therapy.

Department of Corrections employee Michelle Kaiser supervises community corrections officers in Seattle. She testified S.G. received a DOSA for eluding police in a car while under the influence of alcohol. The sentence required S.G. to complete drug treatment during community supervision. S.G. completed inpatient treatment in October 2014, but did not complete outpatient treatment and had not reported to the Department since that time. An outstanding arrest warrant still existed at the time of trial.

---

[6] F.P.'s mother, K.P., echoed her daughter's testimony.

Cynthia Blair, a supervisor for the Office of Indian Child Welfare, testified as a qualified expert witness under ICWA. 25 U.S.C. § 1912(f); see In re Welfare of L.N.B.-L., 157 Wn. App. 215, 245-46, 237 P.3d 944 (2010) (describing "qualified expert witness" under ICWA). She addressed whether the Department made active efforts to work with the Tribe for purposes of termination. Blair testified that she reviewed B.A.'s case file and concluded the Department made active efforts to coordinate its actions with the Yakama Nation Tribe but the Tribe was "not responsive." In Blair's opinion, the Department made "active efforts" to reunify B.A. with her parents and to engage the Tribe in finding a placement consistent with ICWA's placement preferences. She believed B.A. would be at risk if she were reunified with S.G.:

> [B.A.] has no relationship with [S.G.] He's not stable; we don't know where he's living. It's unknown what kind of environment she would . . . go into with him. . . . She needs . . . consistency, she needs support, and she's getting that in the home that she's in.

Blair concluded that termination would be in B.A.'s best interest.

Blair also testified the placements frequently are made in "non-Native home[s]" because there are "very few Native American homes, foster homes." When asked if B.A. was "in an appropriate placement [given] the ICWA order of [placement] preferences," Blair said: "It's my understanding in review of the file . . . that there had been no identified relatives that could take the children. She is with her younger brother. It's a . . . stable placement. So, I . . . believe it's the best placement she can be in at this time."

11

Blair corroborated Carson's testimony regarding the Department's standard approach to placement, stating:

A . . . And again, we have a relative search unit that provides us—they go in—they have additional access to certain websites and things that help in relative searches, and then they send letters out to relatives, and then those letters are given to us and we're notified if a relative comes forward and says they're interested . . . .

. . . .

Q So, does the Department seek out possible placements [with relatives]?

. . . .

A Absolutely. And we also go to the tribes, and it's customary for us to ask the tribes if they have foster homes or relatives or tribal—other tribal members that could take the children.

. . . .

Q And—and per your review of this file, did the Department do that?

A They attempted to. They regularly attempted to bring the tribes on board.

The court ruled orally that the Department had not only met its burden, but that "every element has been one that would meet the standard of beyond a reasonable doubt."

Findings and Conclusions

On June 3, 2016, the court entered findings, conclusions and an order terminating S.G.'s parental rights. The court found in pertinent part:

2.14 All necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to the father.[7]

---

[7] Findings addressing the statutory criteria for termination are emphasized for easy identification.

12

The father did not respond to most services. Without attending or fully complying with the identified services [(]i.e[,] parenting assessment, and drug/alcohol treatment, other services[)] cannot be determined. The father established paternity; he attempted drug/alcohol treatment on multiple occasions; he failed to contact the social worker to allow her to set up the parenting assessment; and he failed to attend referred urinalysis.

. . . .

2.16 Ms. Carson sent the father numerous service letters after verifying that he receives his mail at his mother's residence. Ms. Carson attempted to call the father on multiple occasions, and his phone would either not be functioning or the voicemail would be full. Ms. Carson met with [S.G.] in person to discuss services, and attempted to set up further in-person meetings but he would fail to attend the meeting.

. . . .

2.19 [S.G.] attended inpatient treatment through American Behavioral Health Systems [(ABHS)] as part of his DOSA sentence following his felony conviction for attempting to elude a police vehicle and misdemeanor conviction for Driving Under the Influence in January 2014. [S.G.] completed treatment on May 6, 2014.

2.20 On May 22, 2014, a probation violation was filed for multiple violations including consuming both cocaine and marijuana on May 13, 2014, just seven days after completing treatment. On August 1, 2014, the father admitted the probation violations and was ordered to complete inpatient treatment and provide weekly UA's. On August 14, 2014, a second probation violation was filed again for multiple violations including consuming cocaine and marijuana on August 11, 2014, and failing to enter treatment. A supplemental probation violation as filed for consuming alcohol on August 20, 2014. [S.G.] again admitted violations and eventually reentered treatment, which he completed on October 29, 2014.

2.21 Just seven days after completing treatment through ABHS for the second time, [S.G.] again violated the terms of his probation. A violation was filed and [S.G.] failed to appear in court. On November 7, 2014, a warrant was issued for his arrest.

2.22 The November 7, 2014, felony arrest warrant is still active. CCO Michelle Kaiser said that if [S.G.] is located he will be arrested and

the Department of Corrections intends to recommend that he be sentenced to prison to serve his 17-22 month prison sentence.

2.23 [S.G.] has been diagnosed with Cocaine Dependence, Cannabis Dependence, and Alcohol Dependence by Chemical Dependency Professionals with Seattle Indian Health Board. [S.G.] began using Cocaine and Alcohol around the age of 12, and Cannabis at the age of 18.

2.24 Seattle Indian Health Board recommended in November 2015 that the father complete Intensive Inpatient Treatment. The father attended Inpatient Treatment at Thunderbird Treatment Center. Upon discharge it was recommended that he complete Outpatient Treatment. Other than the intake, the father never attended outpatient treatment and as of the conclusion of the trial there exists no evidence that he has completed outpatient treatment.

2.25 Chemical dependence on cocaine, cannabis and alcohol impairs [S.G.]'s judgment skills, attention skills, and his focus. It causes a lack of stability in housing, employment, and meeting day to day needs. The substances would prevent [S.G.] from planning for and meeting the daily needs of [B.A.].

2.26 [S.G.] has not financially provided for his other children aside from [B.A.] and according to the testimony of Christopher Glaser he currently owes approximately $44,000 in back child support.

2.27 There is little likelihood that conditions will be remedied so that [B.A.] can be returned to [S.G.] in the near future.

2.28 [B.A.] is currently seven and half years old. The father's criminal issues are uncontested, and when he gets apprehended on his warrant it is more likely than not that he will serve prison time for at least a year and a half if not longer. The likelihood is that [S.G.] will not be able to be a full time parent to [B.A.] for at least three years. That is a very long time and is not a reasonable amount of time for a child of [B.A.]'s age to have to wait.

2.29 [B.A.] has a lot of special needs, mental health diagnoses of anxiety and posttraumatic stress disorder with a rule out for Reactive Attachment disorder, and takes medications including Melatonin and Guanfacine.

2.30 [B.A.] can have severe tantrums that include screaming, hitting, kicking, and biting. She also has a history of self-harm, physically harming her younger brother, and hurting household pets. If her

schedule becomes unpredictable she can put herself into situations that can harm her. She cannot be given access to scissors at home or at school because she will cut toys, clothes, or other students. This is connected to her impulsivity.

2.31 [B.A.] can be very impulsive, which can put her into dangerous situations. She solicits contact from strangers primarily older males and sometimes in inappropriate ways.

2.32 [B.A.] meets weekly with her therapist and every other week with an attachment therapist. She also has IEP meetings at her school.

2.33 [B.A.] has been ready for at least a year and a half for this case to end. She reminds the caregivers that everyone needs to do a better job to end this case, and wants the judge to know that she wants the case to end.

2.34 [B.A.]'s anxiety will continue to be aggravated by [S.G.]'s unstable life, and his inability to be able to provide permanence. At this time there is no way to anticipate that the father is going to take any different actions in his life that would be beneficial for [B.A.].

2.35 [S.G.] has had very limited contact with [B.A.] throughout her life. There is no evidence that [S.G.] had any contact with [B.A.] before the dependency started. During the dependency he has had one impromptu visit with her, and one telephone conversation with her.

2.36 [S.G.] promised [B.A.] that he would send her cards and letters; however, he has never sent any. [B.A.] has asked her caregivers why she does not receive any letters from her father.

2.37 On October 16, 2015, the father filed a report to court where he stated that he has not sought visits with Brenda due to his relapse. He said he would start visits and the parenting assessment as soon as he was clean.

2.38 In person visits between [S.G.] and [B.A.] were suspended by the Dependency court on January 12, 2016, as not being in [B.A.]'s best interests and they would be detrimental to her emotional welfare.

2.39 The current foster mother has promoted Native American culture to [B.A.] in several ways. She has obtained a Jingle dress and signed [B.A.] up for Native American dance classes, has participated in drum making, taken [B.A.] to several pow-wow's, purchased and provided books on Native American culture, kept [B.A.] in contact

15

with family friend and tribal member Nellie who has been able to share Native American culture and customs with [B.A.]

2.40 The father does not have suitable housing for [B.A.] to reside in at this time. Additionally, there is no evidence that the father is employed or has the financial resources to provide for [B.A.]

2.41 [S.G.] has failed to substantially improve his parental deficiencies in the twenty four months following the entry of the disposition order.

2.42 Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. [S.G.] has never been able to provide [B.A.] with a stable home in the past. He has not demonstrated the ability to provide his child with a stable home currently, and will not be able to do so in the near future. [B.A.] is adoptable and has prospects for adoption. [B.A.] cannot be adopted unless parental rights are terminated.

2.43 The Department has given consideration to alternative permanent plans. There was no evidence before the court that identified a viable alternative permanent plan other than adoption.

2.44 S.G. is currently unfit to parent [B.A.].

2.45 [B.A.] would be at serious risk both physically and emotionally if placed with [S.G.] Indian expert Cynthia Blair opines that this risk is created by [S.G.]'s untreated alcohol and substance abuse which leads to instability for [B.A.] because of a lack of awareness and judgment while impaired; his unstable living environment; his lack of relationship with [B.A.] and no understanding of her emotional needs.

. . . .

2.47 Ms. Elias has regularly sent her CASA reports to the Yakama Nation, but has never received any contact back from the tribe. Ms. Elias also has never been contacted by [S.G.]

2.48 Ms. Elias finds it very important that the foster family has maintained [B.A.]'s Native American background. She has observed that [B.A.] enjoys learning about her culture.

2.49 Ms. Elias believes that it would be devastating for [B.A.] to wait another six months for permanence. She believes that the near future for [B.A.] is now.

2.50  Ms. Elias believes that termination of [S.G.]'s parental rights is in [B.A.]'s best interest.

2.51  The court finds by a preponderance of the evidence that termination of parental rights is in the best interests of [B.A.]. The father will not be able to remedy his parental deficiencies within the near future. [B.A.] has a right to a safe, stable, and permanent home and to a speedy resolution of this termination proceeding.

2.52  Pursuant to 25 U.S.C. § 1912(f), the court finds beyond a reasonable doubt from the evidence presented, including the testimony of a qualified Indian expert witness, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

. . . .

III. Conclusions of Law

. . . .

3.2  Termination of the parent-child relationship between the above-named minor child and the father is in the child's best interest. ·

3.3  The foregoing findings of fact and the allegations of RCW 13.34.180 and .190 have been proven by clear, cogent[,] and convincing evidence unless otherwise noted.

3.4  The Court concludes that the legal standard of proof for proving the elements in RCW 13.34.180(1)(a-f) is clear, cogent, and convincing evidence, however, the elements in this case have been proven by even the higher standard of proof of beyond a reasonable doubt.

3.5  Pursuant to 25 U.S.C. § 1912(d), active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and these efforts have been unsuccessful.

3.6  Pursuant to 25 U.S.C. § 1912(f), the court finds beyond a reasonable doubt from the evidence presented, including the testimony of a qualified expert witness, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.[8]

---

[8] (Emphasis added.)  Gladstone assigns error to finding of fact 2.15, 2.27, 2.28, 2.42, 2.44, 2.45, 2.51, 2.52 and conclusion of law 3.2-3.6.

S.G. appeals.

## Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence[9]:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . ; and
>
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1), .190(1)(a)(i). If the trial court finds that the State has met its burden under RCW 13.34.180, it must then find by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b).

---

[9] "Clear, cogent and convincing" means highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

When termination proceedings involve an Indian child, ICWA and WICWA require the court to make two additional determinations. First, the court must find by clear, cogent, and convincing evidence that the Department made "active efforts" to help the parent remedy his or her parental deficiencies. 25 U.S.C. § 1912(d); RCW 13.38.130(1); see, e.g., In re Dependency of A.M., 106 Wn. App. 123, 130-31, 135, 22 P.3d 828 (2001) (clear, cogent, and convincing standard applies to 25 U.S.C. § 1912(d)). Second, the court must find that the Department proved, beyond a reasonable doubt, that the parent's continued custody of the child is likely to result in "serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); RCW 13.38.130(2).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings are reviewed for substantial evidence. Id. at 728. Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. Id.; In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

## DISCUSSION

I.   Motion to Transfer Jurisdiction

S.G. first contends the superior court abused its discretion in denying his motion to transfer jurisdiction to the tribal court under ICWA, 25 U.S.C. § 1911(b) and WICWA,

RCW 13.38.080(2).[10] He concedes those Acts grant any parent the power to veto a transfer to tribal court and that "[a] trial court therefore errs when it transfers jurisdiction over a parental veto." Nevertheless, he contends the mother's veto in this case was ineffective because she had already consented to tribal jurisdiction. Citing In re the Welfare of R.I., 402 N.W.2d 173 (Minn. App. 1987), he claims she impliedly consented to tribal jurisdiction when she left B.A. and her siblings at the Indian Child Welfare office and said she intended to relinquish her parental rights. The Department contends R.I. is distinguishable. We agree with the Department.

The children in R.I. became wards of an Oregon tribal court when their mother left without them to live in Minnesota. Id. at *174. The mother subsequently returned to the reservation and took the children to Minnesota. Id. at *175. Later that year, a Minnesota court declared the children dependent and placed them in temporary foster

---

[10] Without citing relevant authority, the Department contends Gladstone's failure to immediately appeal the order denying the motion to transfer precludes review of that order in this appeal from the later order terminating parental rights. Because Gladstone's challenge to the order denying transfer lacks merit in any event, we need not reach the Department's argument. We note, however, that there is authority holding that failure to seek interlocutory review of similar orders waives review absent a showing of prejudice. See Lincoln v. Transamerica Inv. Corp., 89 Wn.2d 571, 578, 573 P.2d 1316 (1978) (where party fails to seek immediate review of decision denying change of venue, review of that decision is waived absent a showing of prejudice); Saleemi v. Doctor's Assocs., Inc., 176 Wn.2d 368, 387, 292 P.3d 108 (2013) (party who fails to seek review of an order compelling arbitration on venue grounds until after the arbitrators award is known must show prejudice before an appellate court will reach the merits); but see In re Interest of E.D., 886 N.W.2d 107 (Iowa Ct. App. 2016) (because order denying transfer did not dispose of all issues in the case, it was not final appealable order and mother was entitled to raise the issue on appeal from the final termination ruling). In addition, given the strong interests in finality and expediency in matters involving children, there may be policy reasons to encourage immediate appeals of transfer decisions.

care. Id. The tribal and state court agreed that the state court "would continue to exercise 'courtesy supervision' of the case." Id. The mother then took the children back to the reservation without the permission of the state court or the children's legal custodians. Id. Once there, she was arrested for possession of narcotics and pleaded guilty. Id. The tribal court gave her funds to return with the children to Minnesota and warned that custody proceedings would commence if she and the children remained on the reservation. Id. The mother took the money and moved off the reservation, but left the children behind. Id.

The Tribal Court then issued an emergency custody order, found the children were abandoned, and placed them in the custody of their aunts. Id. The tribe filed a motion to transfer the state court proceedings to the tribal court, but the mother objected. Id. at *175-76. In granting the motion, the state court ruled that the mother consented to transfer by leaving her children on the reservation and that her consent negated her objection to the transfer. Id. at *176. The appellate court affirmed, stating in part,

> The Tribal Court and the State argue and the trial court found that although appellant verbally objected to the transfer of the proceedings, she impliedly consented to the transfer by voluntarily bringing the children to the Warm Springs Reservation. Appellant argues that the Tribal Court had no right to issue an emergency custody order, claiming that she placed the children with her extended family in accordance with accepted Indian custom. The Tribal Court, however, found that she had abandoned the children. We will not disturb that finding. We hold that the trial court properly concluded that appellant consented to the transfer of jurisdiction by leaving her children on the reservation.

Id. at 177 (emphasis added). This case differs from R.I. in several significant respects.

21

First, neither the tribal court nor the state court made a finding in this case that B.A.'s mother legally abandoned her children on the reservation. Second, prior to the abandonment of the children in R.I., the tribal court had already issued custody orders making the children wards of the Tribal Court. As the Department points out, those custody orders gave the Tribal Court exclusive jurisdiction of the children under 25 U.S.C. sec. 1911(a) ("Where and Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction."). There were no prior tribal court proceedings in this case and B.A. was never a ward of that court. Third, the mother in R.I. abandoned her children on the reservation with full knowledge that her action would result in custody proceedings in the Tribal Court. B.A.'s mother did not act with such knowledge. R.I. is thus inapposite.

S.G. fails to demonstrate that the court abused its discretion in denying the motion to transfer.

II.   Statutory Prerequisites to Termination.

S.G. contends several findings supporting the statutory prerequisites for termination are not supported by the record. For the reasons set forth below, we conclude the findings are supported by sufficient evidence.

A. Likelihood of Reunification.

Before parental rights can be terminated, RCW 13.34.180(e) and RCW 13.34.190(1)(a)(i) require the Department to prove by clear, cogent, and convincing evidence "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The focus of RCW 13.34.180(1)(e) is

22

on whether a parent's identified deficiencies have been corrected. In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). In this case, the trial court found the Department satisfied RCW 13.34.180(e).[11] S.G. argues, however, that "[n]either current deficiencies nor the low probability of conditions being remedied was proven by clear, cogent, and convincing evidence in this case." We disagree.

The Department had the burden of demonstrating it was highly probable that there was little likelihood S.G. could remedy his parental deficiencies in the near future. In re Welfare of C.B., 134 Wn. App. 942, 952, 143 P.3d 846 (2006). Ample evidence demonstrated that S.G. made little progress over the 29 month dependency. Unchallenged findings establish that he failed to complete drug/alcohol treatment, contact social workers to set up a parenting assessment, perform urinalysis, or even attend trial. He repeatedly violated conditions of his DOSA sentence, had an outstanding arrest warrant at the time of trial, and, according to his CCO, will be arrested when located. The CCO testified, and the court found, that the Department of Corrections will likely recommend a sentence of 17-22 months in prison.

S.G. contends "it is not a foregone conclusion that [he] will be sent to prison to serve the remainder of his sentence." S.G. is correct. But, the court nevertheless properly considered the CCO's testimony since it bore on the likelihood that B.A. will be returned to S.G. in the near future.

---

[11] Finding of fact 2.27 states, "There is little likelihood that conditions will be remedied so that [B.A.] can be returned to [S.G.] in the near future."

S.G. also points to evidence that he "was at least partially capable of succeeding in drug treatment." But, unchallenged findings establish that whatever success S.G. had in treatment has been exceedingly short-lived. It is, in fact, highly probable that S.G. would relapse from any future treatment in a very short period of time. Furthermore, S.G. would almost certainly need to demonstrate a substantial period of sobriety before a court would consider him fit to parent B.A. There is no likelihood he could remedy his drug/alcohol deficiency in the near future. Finding of fact 2.27 is supported by substantial evidence.

B. Early Integration into a Stable and Permanent Home.

S.G. next contends the Department failed to satisfy RCW 13.34.180(1)(f) and RCW 190(1)(a)(i), that require clear and convincing evidence "[t]hat the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." The trial court found:

> . . . Continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. [S.G.] has never been able to provide [B.A.] with a stable home in the past. He has not demonstrated the ability to provide his child with a stable home currently, and will not be able to do so in the near future. [B.A.] is adoptable and has prospects for adoption. [B.A.] cannot be adopted unless parental rights are terminated.

S.G. claims "[t]he record does not show that [B.A.] experiences a lack of stability in placement with her foster family, nor does the record show that continuing her relationship with her father would jeopardize the placement." He also claims "there is no showing that [B.A.'s] bond to her foster family would be undermined by a continued relationship with her father." S.G. ignores substantial evidence that B.A. needs

24

permanency, especially given her anxiety issues, that she is adoptable and wants to remain with her brother and foster parents, that visits with S.G. were suspended by the court because they were detrimental to B.A.'s emotional welfare, and that B.A.'s <u>early</u> integration into a stable and <u>permanent</u> home cannot be achieved until S.G.'s parental rights are terminated. Where "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement," RCW 13.34.180(1)(f) is satisfied. <u>In re Welfare of R.H.</u>, 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

S.G. also points out that "[o]ther options, short of termination, can provide stability and permanence without entirely cutting off all connection to the natural parent." He argues that "[w]hen the options short of termination . . . remain unexplored, the [D]epartment has not proven that a continued relationship with the parent diminishes the child's prospects for integration into a stable and permanent home." S.G. cites no authority for this proposition. Nor does he assign error to the court's finding that "[t]he Department has given consideration to alternative permanent plans. There was no evidence before the court that identified a viable alternative permanent plan other than adoption."

The court's finding that the Department satisfied RCW 13.34.180(1)(f) is supported by substantial evidence.

C. <u>Current Parental Unfitness</u>.

In addition to the statutory prerequisites to termination, the State must prove the parent is "currently unfit to parent." <u>In re Parental Rights to B.P.</u>, 186 Wn.2d 292, 312–

25

13, 376 P.3d 350 (2016). To prove unfitness, the State must show that the parent's deficiencies make him or her incapable of providing "'basic nurture, health, or safety.' " Id. at 313 (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2004)). The trial court found that "S.G. is currently unfit to parent" B.A. S.G. claims the court's finding is not supported by clear, cogent, and convincing evidence because there was "no impediment to at least establishing visitation such that he could serve as a [nonresidential] parent until his warrant status, substance abuse issue, and housing situation was resolved."

S.G. cites no authority, nor have we found any, supporting the proposition that a finding of current parental unfitness is precluded if a parent can serve as a nonresidential parent. The proposition runs counter to the above-mentioned rule that parental fitness rests on the parent's ability to provide basic nurture, health, or safety. Clear, cogent, and convincing evidence established that S.G. was incapable at the time of trial of providing nurture, health, or safety for B.A. His ongoing substance abuse and repeated DUIs demonstrated that he could not provide safety for B.A. He had no housing, no employment, no bond with B.A., and no interest in, or understanding of, her special needs. In re Parental Rights to K.M.M., 186 Wn.2d 466, 490, 379 P.3d 75 (2016) (in determining parental fitness, it is necessary to consider whether a parent is capable of parenting the particular child given the child's specific, individual needs).

In addition, a parent is deemed unfit if the Department satisfies the criteria for termination in RCW 13.34.180(1) and proves that termination is in the best interest of the child. In re Parental Rights to K.J.B., 187 Wn.2d 592, 598, 387 P.3d 1072 (2017).

26

As discussed above, the Department met those burdens in this case. The court's finding of parental unfitness is supported by substantial evidence.

### D. Active Efforts under ICWA.

S.G. maintains the Department failed to make the "active efforts" required by ICWA and WICWA.[12] He contends "[t]he Department's failure to immediately place [B.A.] with S.G.'s extended family under 25 U.S.C. 1915 violated the 'active efforts' requirement of 25 U.S.C. 1912(d)."[13] Noting that 25 U.S.C. § 1915(b) gives priority to an Indian child's extended family in placement decisions, S.G. alleges the Department "summarily rejected" B.A.'s paternal grandmother as a placement option and "apparently took no further action to find other paternal relatives capable of caring for her." This claim fails for several reasons.

First, S.G. agreed to continue B.A.'s nontribal foster care placement in the agreed order of dependency. Second, S.G. fails to demonstrate how the Department's efforts in exploring possible placements at the time of the initial placement decision are

---

[12] 25 U.S.C. § 1912(d); RCW 13.38.130(1). The former states:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d).

[13] "Active efforts" are defined as "a showing to the court that the department or supervising agency social workers actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs ordered by the court or identified in the department or supervising agency's individual service and safety plan beyond simply providing referrals to such services." RCW 13.38.040(1)(a)(iii).

material to the criteria for termination of his parental rights.[14] Third, the Department did not summarily reject B.A.'s paternal grandmother as a placement option and used "active efforts" in its placement decision. At the time of B.A.'s initial removal and placement, the Department considered placement with "the paternal grandmother, 2 maternal great aunts, 2 maternal aunts, and [the] girlfriend of Father S.G." Caseworker Carson also testified that the Department vetted S.G.'s mother as a potential placement, but her age and health issues disqualified her given B.A.'s special needs.

### E. Likely Serious Physical or Emotional Damage under ICWA.

Under 25 U.S.C. § 1912(f), the Department has the burden of proving beyond a reasonable doubt that "custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." The trial court found the Department carried its burden, stating:

> Pursuant to 25 U.S.C. § 1912(f), the court finds beyond a reasonable doubt from the evidence presented, including the testimony of a qualified Indian

---

[14] As counsel for the Department noted during argument on his successful motion to strike testimony concerning placement:

> There is nothing within the termination statutes or termination case law that says that failure to follow the placement preferences . . . is an[] element that must be proven or rebutted within termination. This child was emergency placed one day after the mother dropped the child off . . . with the Department. . . . [A]t that time, the Department would not have even known that the father had Native American background. . . . [T]he Department did have discussions with the grandmother about her ability to parent and be a placement, and due to her medical needs it was determined by the Department she would not be a suitable placement to handle the behavioral issues that [B.A.] presents. So, it's not that the Department completely ignored this relative, or other potential placements, but placement issues are not relevant to termination and do not need to be proven or rebutted in termination. Those are issues for the underlying Dependency Court.

28

expert witness, that continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.

S.G. contends this finding is not supported by substantial evidence. Again, we disagree.

The Department's qualified Indian expert, Blair, testified that B.A. would be at serious risk of physical or emotional harm if she were reunited with S.G.. Reunification would be particularly risky given "the fact that [S.G.] motioned for . . . visits, and they were denied for therapeutic reasons." Blair believed B.A. would suffer serious emotional harm because she has anxiety, PTSD, and attachment issues and "has no relationship with S.G.. He's not stable; we don't know where he's living. It's unknown what kind of environment she would . . . go into with him." Caseworker Carson concurred, stating: "[B.A.] already struggles with attachment issues, and she's been working through some of that. And her trauma, I think not having an established relationship with [S.G.] is going to cause more trauma and more anxiety."

In addition to Blair and Carson's testimony, S.G.'s ongoing substance abuse, DUIs, lack of housing, lack of employment, and likely incarceration supported the court's finding, beyond a reasonable doubt, that placing B.A. in S.G.'s custody would likely result in serious emotional or physical harm.

Affirmed.